J-S40017-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1692 EDA 2022 |

Appeal from the Order Entered June 3, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-0000701-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: S.Q.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1693 EDA 2022 |

Appeal from the Decree Entered June 3, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000134-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: I.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1694 EDA 2022 |

Appeal from the Order Entered June 3, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-1000162-2016

J-S40017-22

IN THE INTEREST OF: I.C., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
APPEAL OF: A.S., MOTHER :
:
:
:
:
:
:
: No. 1695 EDA 2022

Appeal from the Decree Entered June 3, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000160-2018

IN THE INTEREST OF: K.S., A : IN THE SUPERIOR COURT OF
MINOR : PENNSYLVANIA
:
:
APPEAL OF: A.S., MOTHER :
:
:
:
:
: No. 1696 EDA 2022

Appeal from the Order Entered June 3, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-0000630-2018

IN THE INTEREST OF: K.A.S., A : IN THE SUPERIOR COURT OF
MINOR : PENNSYLVANIA
:
:
:
APPEAL OF: A.S., MOTHER :
:
:
:
:
: No. 1697 EDA 2022

Appeal from the Decree Entered June 3, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000393-2021

BEFORE: PANELLA, P.J., STABILE, J., and KING, J.

MEMORANDUM BY STABILE, J.: **FILED JANUARY 9, 2023**

- 2 -

A.S. ("Mother") appeals from the decrees entered June 3, 2022, in the Philadelphia County Court of Common Pleas, involuntarily terminating her parental rights to I.C., born in October 2013; S.N. a/k/a S.Q.N., born in March 2017; and K.S. a/k/a K.A.S., born in March 2018 ("the Children," collectively). In addition, Mother appeals from the June 3, 2022 order changing the Children's permanency goals from reunification to adoption.[1] Upon review, we affirm the termination decrees and dismiss the appeals from the goal change orders as moot.

The relevant facts and procedural history are as follows. In June 2016, then two-year-old I.C. was removed from Mother's care due to Mother's drug use and her failure to meet I.C.'s medical needs. N.T., 6/3/22, at 7, 9, 14 18. Mother's drug of choice was phencyclidine ("PCP"). *Id.* at 21, 60. I.C. was placed in the home of his maternal great-aunt, J.V., where he remained through the termination hearing. *Id.* at 14. On June 17, 2016, the trial court adjudicated I.C. dependent and fully committed him to the Philadelphia Department of Human Services ("DHS"). The court held permanency hearings for I.C. at regular intervals. The following single case plan ("SCP") objectives were established for Mother: (1) to comply with dual diagnosis treatment,

---

[1] By separate decrees entered on the same date, the trial court involuntarily terminated the parental rights of: A.C., father of I.C.; Q.N., father of S.N. and K.S.; and any unknown father. The fathers have not filed a separate appeal as to the decrees or goal change orders, and they did not participate in the present appeals.

including mental health and drug and alcohol; (2) to attend extensive outpatient therapy; (3) to attend three random drug screens; (4) to comply with court-ordered supervised visitation; (5) to obtain appropriate housing; (6) to maintain employment and provide proof of income; and (7) to attend Achieving Reunification Center ("ARC") for parenting, housing, and employment services. *Id.* at 17-18.

In March 2017, S.N. was born positive for substances, the nature of which are unspecified in the record, and he was removed from Mother's care due to her drug use. *Id.* at 80-82. Soon after birth, S.N. was placed in the home of another maternal great-aunt ("Maternal Great-Aunt") and has since remained in that home.[2] *Id.* at 80. On April 26, 2017, the trial court adjudicated S.N. dependent and fully committed him to DHS. The court held permanency hearings at regular intervals throughout S.N.'s dependency case.

One year later, in March 2018, K.S. was born and placed in the home of a family friend ("Foster Parent"), where he has since remained. *Id.* at 101. On May 29, 2018, the court adjudicated K.S. dependent and fully committed him to DHS. Permanency hearings were held at regular intervals throughout K.S.'s dependency case.

---

[2] Community Umbrella Agency ("CUA") caseworker, Ahmani Quarles, initially identified S.N.'s caregiver as paternal great-aunt, but her subsequent testimony indicates that the caregiver is Maternal Great-Aunt. N.T., 6/3/22, at 80, 85-87.

As a result of her arrests on August 21, 2017, and October 5, 2017, Mother pled guilty to manufacturing, delivery, or possession with intent to manufacture or deliver. DHS Exhibit 3. Mother was arrested again on February 7, 2018, and entered a guilty plea to manufacturing, delivery, or possession with intent to manufacture or deliver, and intentional possession of controlled substance by person not regulated. *Id.* Mother received a sentence of five years of probation. *Id.*

On April 20, 2021, Mother began participating in drug and alcohol treatment through the House of Counseling a/k/a Casa de Consejeria ("House of Counseling"), but she stopped attending after January 27, 2022. N.T., 6/3/22, at 19, 62-63. In addition, Mother was involuntarily admitted to Temple Episcopal Hospital due to a "mental breakdown," and she was discharged on June 1, 2021.[3] *Id.* at 31-32.

DHS filed petitions to involuntarily terminate Mother's parental rights and change the permanency goal to adoption on: March 5, 2018, for I.C.; February 28, 2019, for S.N.; and July 16, 2021, for K.S.[4] Subsequently, DHS

---

[3] The record does not reflect the date of Mother's admission to Temple Episcopal Hospital. As best we can discern from the record, her admission occurred in 2021. *See* N.T., 6/3/22, at 31-32, 63-64.

[4] Our review of the certified record shows that the hearings on the involuntary termination and goal change petitions for I.C. and S.N. were continued several times.

filed amended petitions for involuntary termination of Mother's rights and goal change with respect to I.C. and S.N. on July 20, 2021.[5]

The trial court conducted a hearing on the petitions for the Children on June 3, 2022, during which the best interests of the Children were represented by guardian *ad litem*, Maureen Pie, Esquire, and the Children's legal interests were represented by attorney Lisa Visco, Esquire.[6] Mother was present and represented by counsel. DHS presented testimony from CUA caseworker Ahmani Quarles. Mother testified on her own behalf.

At the termination hearing, Ms. Quarles testified she has been assigned to work with this family since September 23, 2020. N.T., 6/3/22, at 8. Ms. Quarles testified that I.C. receives behavioral and therapeutic services to address his outbursts, behaviors, and his "severe" attachment issues toward J.V., his maternal great-aunt. **Id.** at 14-15. Ms. Quarles testified that Mother saw I.C. only twice in the past six years, and I.C. refuses to have visits with Mother. **Id.** at 37-38, 49.

---

[5] The amended goal change and termination petitions include additional facts regarding the hearings that occurred subsequent to the filing of the initial petitions.

[6] Legal counsel for the Children informed the trial court that "all three [C]hildren look to their [respective] caretaker[s] as a mother, and they believe that that's their mother and they want to stay there and be adopted." N.T., 6/3/22, at 129.

With respect to S.N., Ms. Quarles testified that Mother only saw S.N. two times when he was a baby, and S.N. does not know who Mother is. *Id.* at 82, 84. On direct examination, Mother testified that she stopped confirming visits with S.N. *Id.* at 98. When asked why she stopped, Mother testified that "not bringing him home" and "[t]he whole situation" "used to bother" her. *Id.* at 98-99.

As to K.S., Ms. Quarles testified that he is on the autism spectrum and has behavioral issues. *Id.* at 102. Ms. Quarles described K.S. as "a head-banger," noting that he "continues to hit his head." *Id.* Ms. Quarles testified that K.S. receives speech and special instruction, occupational therapy ("OT"), and applied behavioral analysis ("ABA") services for his behavioral concerns. *Id.* With respect to visitation, Ms. Quarles testified that Mother was inconsistent with visitation throughout 2021, and she attended only three visits with K.S. in 2022, despite confirming twelve out of twenty-one visits offered. *Id.* at 103-105. Ms. Quarles testified that, due to K.S.'s behavior, nine of the confirmed visits did not occur. *Id.* at 104. While CUA attempted to reschedule the canceled visits, Mother never confirmed for these "make-up" visits. *Id.*

By separate decrees entered June 3, 2022, the trial court involuntarily terminated Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). By separate orders entered on the same date, the court changed the Children's permanency goals to adoption. On July

5, 2022, Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On August 16, 2022, this Court consolidated the appeals *sua sponte*. The trial court issued a Rule 1925(a) opinion dated September 9, 2022.

Mother presents the following issues on appeal for review:

1.  Whether the trial court committed error by involuntarily terminating [M]other['s] . . . parental rights where such determination was not supported by clear and convincing evidence establishing grounds for termination under the Adoption Act, 23 [Pa.C.S.A. § 2511(a)(1), (2), (5), and (8)]?

2.  Whether the trial court committed error by changing the [C]hildren's . . . permanency goal[s] from reunification with the parent(s) to adoption without giving primary consideration to the developmental, physical, and emotional needs and welfare of the [C]hildren as required by the Adoption Act, 23 [Pa.C.S.A. § 2511(b)]?

Mother's Brief at 5.

Our standard of review is well-settled. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." **In re Adoption of C.M.**, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. **Interest of S.K.L.R.**, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error

of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123-24.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *C.M.*, 255 A.3d at 358. Termination of parental rights has "significant and permanent consequences for both the parent and child." *L.A.K.*, 265 A.3d at 591. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, 255 A.3d at 359 (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." *Id.*; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). In evaluating whether the petitioner proved grounds under Section 2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." *Interest of L.W.*, 267 A.3d 517, 524 n.6 (Pa. Super. 2021). If the trial court determines the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court then must assess the petition under Section 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

In the instant case, we analyze the trial court's involuntary termination decrees pursuant to Section 2511(a)(8) and (b).[7] The Adoption Act, in relevant part, provides:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions

---

[7] This Court need only agree with any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Therefore, we need not review Mother's argument with respect to Section 2511(a)(1), (2), and (5).

> which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

To satisfy Section 2511(a)(8), the petitioner must prove: (1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. *In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018).

Unlike other subsections, Section 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children. *In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). "[T]he relevant inquiry" regarding the second prong of Section 2511(a)(8) "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at

- 11 -

the time of the hearing." ***In re I.J.***, 972 A.2d 5, 11 (Pa. Super. 2009).

Further, the Adoption Act prohibits the court from considering, as part of the

Section 2511(a)(8) analysis, "any efforts by the parent to remedy the

conditions described [in the petition] which are first initiated subsequent to

the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).

Finally, this Court has explained:

> while both Section 2511(a)(8) and Section 2511(b) direct us to
> evaluate the "needs and welfare of the child," we are required to
> resolve the analysis relative to Section 2511(a)(8), prior to
> addressing the "needs and welfare" of [the child], as proscribed
> by Section 2511(b); as such, they are distinct in that we must
> address Section 2511(a) before reaching Section 2511(b).

***In re Adoption of C.L.G.***, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

With respect to Section 2511(b), this Court has stated that the trial court

"must . . . discern the nature and status of the parent-child bond, with utmost

attention to the effect on the child of permanently severing that bond." ***In re***

***C.M.S.***, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). When

evaluating a bond, "the court is not required to use expert testimony. Social

workers and caseworkers can offer evaluations as well." ***In re Z.P.***, 994 A.2d

1108, 1121 (Pa. Super. 2010) (internal citations omitted).

Further,

> [I]n addition to a bond examination, the trial court can equally
> emphasize the safety needs of the child, and should also consider
> the intangibles, such as the love, comfort, security, and stability
> the child might have with the foster parent.

*In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010). Our Supreme Court explained, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In her first issue on appeal, Mother argues the trial court erred in terminating her parental rights under Section 2511(a)(8) because the conditions that led to the Children's removal did not exist at the time of the hearing. Mother's Brief at 31. Specifically, Mother claims she has been "substance free since October 2021," obtained suitable housing and employment, and "loved and wanted her [C]hildren returned to her custody and care." *Id.* She further contends the evidence is insufficient to show that termination would best serve the needs and welfare of the Children because DHS presented the testimony of a social worker who is unqualified to give an opinion as to parental bond and the impact that severing Mother's rights may have on the Children. *Id.* at 32. She asserts that she loves the Children and wants to reunify with them. *Id.* We disagree.

Mother's drug use had been the primary concern that led to the Children's removal from her care. N.T., 6/3/22, at 18, 81-82. CUA caseworker Ms. Quarles noted that Mother's failure to meet I.C.'s medical needs was another concern leading to I.C.'s removal. *Id.* at 18. The trial court found that, since I.C.'s adjudication in 2016, Mother failed to address her substance abuse concerns. Trial Court Opinion, 9/9/22, at 14. The record supports the trial court's finding.

Although Mother relies on her own testimony that she has been "substance free since October 2021," Mother's self-serving statement, without more, is unpersuasive and belied by the record. *See* Mother's Brief at 31. Ms. Quarles testified that Mother's drug of choice is PCP. N.T., 6/3/22, at 20-21. Ms. Quarles testified Mother started drug and alcohol treatment programs several times but never completed any. *Id.* at 19-20. Mother recently attended treatment at the House of Counseling starting on April 20, 2021, but she stopped attending treatment after January 27, 2022. *Id.* at 19, 63. Ms. Quarles testified that when she asked Mother why she was not receiving services, Mother informed her that "[s]he doesn't have the time." *Id.* at 21. On direct examination, Mother testified she stopped attending treatment because "it was cutting into [her] work schedule."[8] *Id.* at 63.

---

[8] Mother testified that she worked with a cleaning company since October 2021. N.T., 6/3/22, at 65-66. Ms. Quarles testified she never received proof of employment, and Mother informed her that she was working "under the table." *Id.* at 37.

Moreover, Mother did not consistently comply with submitting random drug screens. Ms. Quarles testified Mother submitted two negative screens in 2020 and only "a few" screens at Northeast Treatment Center ("NET") in 2021 that were positive for an unspecified substance. *Id.* at 21-22, 47-48. Ms. Quarles testified that there were additional random screens that she requested Mother attend in 2021, but Mother did not attend those screens. *Id.* at 21-22, 47. In May 2021, Mother submitted a screen that was positive for PCP at the House of Counseling. *Id.* at 20. Mother's only explanation to CUA for not complying with the random drug screens is that she did not have the time. *Id.* at 22. Ms. Quarles testified Mother was also referred to the Clinical Evaluation Unit ("CEU") for a dual diagnosis assessment, but she has not completed the assessment. *Id.* at 21.

Ms. Quarles testified she is concerned that Mother is continuing to use drugs. *Id.* at 22. Ms. Quarles noted that during a visit with Mother in May 2021, Mother was "aggressive" and "appeared to be high." *Id.* at 25. Ms. Quarles testified that Mother "was trying to attack" her, and a couple of people were "trying to hold [Mother] back." *Id.* at 56. Additionally, Ms. Quarles testified Mother appeared "high" during supervised visits in November 2021, and December 2021. *Id.* at 22-23. In those visits, Ms. Quarles observed that Mother was not very engaged, and her eyes appeared "low." *Id.*

In addition to her substance use concerns, the trial court found that Mother failed to fully address her mental health issues. Trial Court Opinion,

9/9/22, at 14. Ms. Quarles testified that Mother was involuntarily hospitalized due to a "mental breakdown" and was discharged on June 1, 2021. N.T., 6/3/22, at 31-32. Ms. Quarles testified that she made several referrals for Mother to receive mental health treatment, but Mother did not attend a single intake appointment. *Id.* at 31. On direct examination, Mother testified that when one of her other children was removed from her care, "I did have a mental breakdown. I snapped." *Id.* at 64. Mother testified that she was diagnosed with depression and anxiety in the past, but she never saw a psychiatrist or counselor. *Id.* at 64. Mother testified, "I just learned how to deal with it." *Id.* at 64-65.

Additionally, Ms. Quarles testified that she referred Mother to ARC several times for housing, employment, and parenting programs. *Id.* at 33. Ms. Quarles testified Mother "was in and out," attending a couple classes but never successfully completing a program. *Id.* With respect to the parenting program, Mother confirmed that she attended classes but never completed the program. *Id.* at 69.

The record does not support Mother's claim that she obtained suitable housing for the Children. On direct examination, Mother testified that she had been living with her sister and her sister's three children since September 2021. *Id.* at 66-68. Though she testified that her name is on the lease, Mother admitted on cross-examination that she never provided Ms. Quarles with such a lease. *Id.* at 68, 78. Ms. Quarles testified that she visited the

home in February, and she found it to be inappropriate.[9]  *Id.* at 34-35.  Ms. Quarles testified that the home was overcrowded, noting that Mother was living in a three-bedroom home with her sister and her sister's children.  *Id.* at 35, 53.  Ms. Quarles made multiple unannounced visits to reassess the home, but those efforts were unsuccessful.  *Id.* at 35-36.

We note that in the introduction to Mother's argument, she claims that the COVID-19 pandemic led to the shutdown of services that "made it impossible" for Mother to receive services or comply with drug screens, and that these restrictions, "whether fully or partially, continued up until the time of this trial on June 3, 2022."  Mother's Brief at 24.  She further claims that DHS did not adequately provide services to the family.  *Id.* at 25-27.  The crux of Mother's argument is that the time limits under the Adoption Act should be stayed or tolled.  *Id.* at 25.  In this case, there is a statutory minimum period of twelve months pursuant to Section 2511(a)(8) of the Adoption Act. 23 Pa.C.S.A. § 2511(a)(8).  Mother's claims are without merit.

As discussed above, Mother was able to attend drug and alcohol treatment at the House of Counseling, but she stopped attending before completing the program.  N.T., 6/3/22, at 19, 62-63.  CUA also referred

---

[9] As best we can discern from the record, Ms. Quarles visited Mother's home in 2022 based on Mother's testimony that she began living at the residence in September 2021, and Ms. Quarles's testimony that Mother has been living in this home "for months."  N.T., 6/3/22, at 54, 67.

Mother for mental health services several times, but she failed to engage in treatment. *Id.* at 31. Mother was able to participate in various programs offered through ARC but never completed any. *Id.* at 33. With respect to her drug screens, Ms. Quarles testified that Mother attended a few screens, but she did not comply with the remaining random screens that were requested by CUA. *Id.* at 21-22. Ms. Quarles testified that Mother's reason for not attending the screens is that she was "busy" and did not have the time. *Id.* at 22. Therefore, the record belies Mother's claims that the pandemic prohibited Mother from obtaining services or that DHS did not make reasonable efforts to arrange such services.

As to the third element of Section 2511(a)(8), while Mother relies on her testimony that she loves the Children and wishes to reunify with them, this Court has found that a parent's love for her child, alone, does not preclude a termination. Mother's Brief at 32; *see In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007) (affirming termination of a mother's parental rights where mother testified that she loved her child, but child was strongly bonded to foster parent and thriving in the foster home). To the extent that Mother argues that a social worker or caseworker cannot testify as to the parent-child bond, her claim fails. This Court has held that expert testimony regarding the bond analysis is not required, and a social worker may testify as to her evaluation of the bond. *Z.P.*, 994 A.2d at 1121.

Here, the record demonstrates that termination of Mother's parental rights would serve the Children's best interests. Ms. Quarles testified that eight-year-old I.C. has been in the home of his maternal great-aunt, J.V., since June 2016, and he is doing well in the home. N.T., 6/3/22, at 7, 14. Ms. Quarles testified that I.C. is "very attached" to J.V. *Id.* at 40. I.C. receives behavioral and therapeutic services to address his behavioral concerns and "severe" attachment issues toward J.V. *Id.* at 15, 40. Ms. Quarles testified Mother visited I.C. on only two occasions in the past six years. *Id.* at 38. Ms. Quarles testified that while Mother attempted to schedule visits, I.C. has refused to visit Mother since before Ms. Quarles began working with the family in September 2020. *Id.* at 8, 37-38, 49.

As for five-year-old S.N., Ms. Quarles testified that S.N. was placed with Maternal Great-Aunt since birth, and he is doing well in that home with no behavioral issues. *Id.* at 80, 87. Ms. Quarles testified S.N. has a very good relationship with Maternal Great-Aunt, whom he identifies as his mother, and has a close relationship with Maternal Great-Aunt's daughter. *Id.* at 82, 85, 87. Ms. Quarles testified Mother visited S.N. only two times when he "was a baby." *Id.* at 82. Ms. Quarles noted that S.N. does not know Mother and refuses visits with her. *Id.* at 82, 84.

With respect to four-year-old K.S., Ms. Quarles testified that K.S. has been in the home of Foster Parent since birth and is doing well in the home. *Id.* at 101. K.S. is on the autism spectrum and has behavioral concerns for

which he receives speech, special instruction, OT, and ABA services. *Id.* at 102. Ms. Quarles noted that K.S. refers to Foster Parent as his mother. *Id.* at 110. Ms. Quarles testified that Mother was inconsistent with visitation in 2021 and visited K.S. only three times in 2022. *Id.* at 103-105. Ms. Quarles acknowledged that some visits in 2022 had to be canceled due to K.S.'s behavior. *Id.* at 104. Ms. Quarles testified that while CUA attempted to schedule "make-up visits," Mother never confirmed for these visits. *Id.*

Ultimately, the record evidence demonstrates that the conditions and causes that led to the Children's removal continued to exist. Mother did not fully address her substance abuse issues, did not engage in mental health services, and did not obtain housing suitable for reunification. It is also undisputed that the Children have been in placement for more than twelve months, satisfying the first element of Section 2511(a)(8). I.C. and S.N. have been in care for more than five years, and K.S. has been in care for four years. Finally, termination of Mother's parental rights would best serve the needs and welfare of the Children because the Children are doing well in their respective placements and receiving appropriate services. Mother did not maintain consistent or regular contact with the Children, and two of the Children, I.C. and S.N., refuse to visit with her. We discern no abuse of discretion or error in the trial court's involuntary termination of Mother's parental rights under Section 2511(a)(8).

With respect to Section 2511(b), Mother argues in her second issue on appeal that the trial court did not give primary consideration to the developmental, physical, and emotional needs of the Children in terminating her parental rights. Mother's Brief at 33-34. Mother largely repeats her argument challenging the third element of Section 2511(a)(8). Specifically, Mother asserts that she loves the Children, has a "strong[,] loving mother-son bond," and wants to reunify with them. *Id.* at 34. She also claims that no expert testimony was presented to show what "potential harm" severing Mother's parental rights would have on the Children and that the testimony of a social worker regarding the parent-child bond and the effect of termination on the Children was insufficient. *Id.* at 33. We do not find Mother's argument persuasive.

As discussed above, a parent's own feeling of love, without more, does not preclude termination of parental rights. *See L.M.*, 923 A.2d at 512. Moreover, social workers and caseworkers may testify as to their assessment of the parental bond, and expert testimony is not required. *See Z.P.*, 994 A.2d at 1121.

Here, CUA caseworker Ms. Quarles testified that she believed that Mother does not have a parent-child relationship with any of the Children. N.T., 6/3/22, at 43, 86, 110. The record reveals that Mother had minimal contact with the Children during the time they were in placement. With respect to I.C., Mother attended only two visits throughout his dependency

case, with her last visit occurring in July 2019. *Id.* at 37-38, 49, 79. Ms. Quarles testified that she did not observe any interactions between Mother and I.C. *Id.* at 39. Ms. Quarles explained I.C. has refused to visit Mother since before Ms. Quarles was assigned to this family in September 2020. *Id.* at 8, 37-38, 49. Moreover, Ms. Quarles testified that Mother never requested updates on I.C., did not ask about his medical or educational appointments, and did not send any cards or gifts to I.C. *Id.* at 39.

As to S.N., Ms. Quarles testified Mother attended only two visits with S.N., which occurred when he "was a baby." N.T., 6/3/22, at 82. Ms. Quarles testified that she did not observe any interactions between S.N. and Mother, and Mother did not provide a reason for failing to attend the visits. *Id.* at 83-84. Ms. Quarles testified S.N. does not know Mother and refuses to visit with her. *Id.* at 82, 84. Mother testified she could not remember when she last saw S.N. and acknowledged that she stopped confirming for visits. *Id.* at 98. Importantly, Mother testified that she and S.N. do not share a bond. *Id.* at 100.

As for K.S., Ms. Quarles testified Mother visited K.S. only three times in 2022 and was inconsistent with visitation in 2021. *Id.* at 103-105. Ms. Quarles testified that she observed the interaction between Mother and K.S. during a visit. *Id.* at 105-106. Ms. Quarles noted that K.S. is "a friendly child"

and "was more so playing with his siblings than [Mother]."[10]  *Id.* at 106.

Mother testified that she believed that she and K.S. have a bond, but K.S. would not be harmed if her parental rights were terminated.  *Id.* at 121-122.

Additionally, Ms. Quarles testified as to the impact that removing the Children from their respective placements would have on each child. With respect to I.C., Ms. Quarles noted that I.C. is doing well in the home of his maternal great-aunt, J.V.  *Id.* at 14.  Ms. Quarles testified that I.C. identifies J.V. as his mother and has a close bond with her.  *Id.* at 40, 43.  Ms. Quarles explained that I.C. is "too attached" to J.V. and presented "severe" attachment issues, for which he is receiving therapeutic services.  *Id.* at 14-15, 40-41. Ms. Quarles noted that I.C. has a sibling relationship with J.V.'s young son. *Id.* at 41.  Ms. Quarles testified that it would harm I.C. if he was removed from J.V.'s home.  *Id.* at 42.

With respect to S.N., Ms. Quarles testified that he is doing well in his placement and has a good relationship with Maternal Great-Aunt, whom he refers to as "mom." *Id.* at 80, 85.  S.N. has been placed with Maternal Great-Aunt since birth, and he has a close relationship with Maternal Great-Aunt's daughter. *Id.*  Ms. Quarles testified that S.N. would suffer detrimental harm if he were removed from Maternal Great-Aunt's home.  *Id.* at 86-87.

---

[10] K.S. has additional siblings who are not subjects of this appeal.

Lastly, as to K.S., Ms. Quarles testified that Foster Parent is a pre-adoptive resource, and K.S. refers to her as his mother. *Id.* at 108, 110-112. Ms. Quarles testified that K.S. has been in Foster Parent's home since birth, and he shares a bond with Foster Parent and a close bond with the foster family. *Id.* at 112. She testified that there "will be harm if [K.S.] is removed" from Foster Parent. *Id.* at 109.

Based on the record evidence, clear and convincing evidence supports the trial court's decision that terminating Mother's parental rights best serves the developmental, physical, and emotional needs and welfare of the Children pursuant to Section 2511(b). Mother had sporadic contact with the Children while in placement. The record demonstrates that the Children have become bonded with their respective caregivers and removing the Children from their placements would cause them harm. Accordingly, the trial court was well within its discretion to terminate Mother's parental rights pursuant to Section 2511(b).

Finally, we turn to Mother's assertion that the trial court erred by changing the Children's permanency goals from reunification to adoption.[11] Mother's Brief at 33. Given our disposition of Mother's appeal from the

---

[11] Mother conflates her challenge to the court's goal change orders with her challenge to the court's termination decrees pursuant to Section 2511(b). *See* Mother's Brief at 33-35. As such, Mother does not develop her argument with any relevant statutory authority or caselaw in support of her claim with respect to the goal change orders. *See* 42 Pa.C.S.A. § 6351(f) (Disposition of dependent child).

involuntary termination decrees, her appeals from the trial court's goal change orders are moot. ***See In the Interest of D.R.-W.***, 227 A.3d 905, 917 (Pa. Super. 2020) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.") (citation omitted).

After careful review, we discern no abuse of discretion or error with the trial court's decision to terminate Mother's parental rights or to change the permanency goals to adoption for the Children.

Termination decrees affirmed. Appeals from the goal change orders dismissed as moot.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/9/2023